Good afternoon, your honors. Suzanne Luban for the petitioner Arthur Anderson. So first I want to address the issue of the original certified issue, the jury's consultation of the weather report on the day of the murders. The issue before this court is clearly prejudice. The state concedes that the court below used the wrong standard and this court needs to evaluate that issue de novo to determine whether there was prejudice. This was clearly a close case. To say that a jury deliberated for nine days and somehow the evidence was overwhelming is contrary to all the Supreme Court cases and this court's cases on extrinsic evidence. In Gibson, the case most analogous to our case, the jury deliberated for only, I think it's nine hours over a period of two and a half days and the court found that significant that they obviously were struggling with the factual issues and did not buy the testimony of an eyewitness. Whereas in our case, nine days, the jury deliberated and there was not a series of possible offenses. Was this such a big issue, though, before the court? Was it such a significant matter that the jury was – that this would have made any difference to a jury? Well, Your Honor, it was – the central defense theory was alibi. And so there were three individuals at Betty Gibson's five-acre home that day who said that around that same time period and all of their time estimates were consistent with each other, although they were not exactly the same series of 15 minutes. They all included that 15 to 20 minutes that Betty Gibson estimated. And she was a very forthright and believable, credible witness. Although she didn't look at a clock, she was a person who worked on her property. She'd been up all day long. She said the afternoon was gone. And she was there and she based in part her testimony of the time on the fact that her daughter-in-law was there washing her car. And when you read Jerry Gould's testimony, you see that she's kind of an obsessive person who had a custom-painted car, washed her car every weekend without fail and would never allow there to be water spots on her car. So the jury found this to be very significant. First, during the testimony, one juror asked for evidence of the time of sundown and was told you can't consult things that are outside the evidence, and so you just have to wait and see if that comes in. And then during the discussion, based on one of the jurors' affidavits, during the discussion, during deliberations of that very issue and whether or not she was right about her time estimate, whether or not both women were correct, they talked about whether or not, you know, it was sunny that day and what was the weather. And one juror spoke up and said, I looked in the NALMAC and I found out that it was not sunny all day. It was overcast. So she could have washed her car at any time. That cut to the heart of the testimony. But she didn't say, I only wash my car when it's not sunny. She said she usually washes it when it's not sunny. I mean, you know, I mean, it was not. She says I'm pretty – she doesn't use the word obsessive, but she says anyone who knows me and knows my car knows I always wash my car and I wait until it's shady. Okay. But that's not to say that if it's shady all day, she doesn't wash it at 5 o'clock anyway. That's true. But that's very different from finding the reasonable doubt based on three people saying he was there in the afternoon and on a sunny day. The detective testified it was a sunny day. What about Mr. Reinhart's testimony? So Mr. Reinhart, he's almost blind in one eye. He testified that he did not know the defendant before. He had never met my client. Reinhart's testimony, just his testimony was he saw the defendant shoot Schmeisser and was also shot at himself by this guy? That's right. And he testifies that he was introduced as Mark, that the intruder was introduced as Mark, and that he didn't know where to find glasses in the cupboard. And this is a person who's been in Bob Schmeisser's house, you know, hundreds of times. And the girlfriend of the victim, Mr. Schmeisser, testified that she had seen those two men together, my client and Mr. Reinhart, four or five times. So his testimony was very suspect. And, in fact, he was challenged. He didn't admit that he was going over there to buy drugs, but I think that was probably a good precaution. Even if you're right about the Almanac thing, which would affect the first incident, the one that was involving Nick and Schmeisser? Well, Ms. Bastana testified that only a minute or two passed between the time she saw my client pull up his car there and exit his car, and that she did not see him enter the Stacey Nick household. And so if that's taken at face value, that he was there for such a short time, then a jury could believe, especially because the prosecution argued that the same person committed both killings, that if he was not the killer of Bob Schmeisser because he was over half an hour away at the precise moment that Schmeisser was killed, then he couldn't have also been, or he probably wasn't, the killer of Stacey Nick. And in any event, he received a life without parole sentence. The special circumstance was multiple murders. And so, clearly, he's been in prison for 20 years. He's been the model prisoner. Let me ask you about the sleeping juror thing. Do I understand correctly that counsel knew that this guy was named Moon, Mr. Moon? The family members who were observing in the courtroom were telling him throughout the trial that this guy is sleeping. So he knows, before they go out to deliberate, that there may or may not be a sleeping juror, that there was a sleeping juror. That's right. Okay. It seems to me there may be any number of reasons why a lawyer would or would not bring that to the attention of the judge. For example, the juror is sleeping through damaging testimony, for one example. Well, except in this case, we know that the testimony that he slept through, Joanne Pastana's testimony, was exculpatory. Even though she was called by the state for part of her testimony, she testified, as I said, about this short period of time. Or they don't want to draw undue attention to it by stopping it and waking the guy up. And building an error. Or they like the juror. You know, even though he's catching a few Zs, they size him up as somebody who's favorable. They don't want to cause a problem. That's not the evidence here. Well, there's no evidence one way or the other. I'm saying that there's good reasons why lawyers may not want to call that to the attention. Well, Your Honor, then you're suggesting that this lawyer unethically argued during a motion for new trial to the judge that this was an error, a constitutional error, and he should invalidate the verdict. Well, his opinion of whether it's an error or not is really not relevant. It's our opinion whether it's error or not. So, I mean, he can have his own opinion, but it really doesn't matter. I mean, what I'm saying is there are reasons why a lawyer would or would not object to a or stop a trial for a sleeping juror. Well, the lawyer in this case gave a declaration that he didn't have such a reason, even though he did cover himself on some of the other alleged errors and say that he had a tactical reason. So certainly if he was going to cover his rear, he would have done it in this situation as well. If we were to conclude that we can't find ineffective assistance of counsel simply because he didn't call this to the judge's attention, let's assume we were to find that. Okay. We'll start with that. You may or may not agree with it, but that's – let me ask you to assume that. Okay. Then the lawyer can't just wait until he gets an unfavorable verdict, can he, and then say, oh, by the way, I knew during the trial the guy was sleeping. I see how it came out. If we get an acquittal, terrific. If not, I'll raise this for the first time afterwards. He can't do that, can he? Well, Your Honor, he had the opportunity. He made the motion for a new trial, and he learned information that he couldn't have learned while the trial was going on. He couldn't speak to the jurors and ask them what they were seeing, what they were hearing Mr. Moon say. So the information that he got after the trial was more significant than he was being told. Well, I'm saying if he knew, and you told me at the beginning, they knew he had gotten information that this guy was sleeping. They can't wait and see how the verdict comes out and say, oh, by the way, I knew during the trial he was sleeping, and I just decided to bring it up now, can they? No, I don't think he can do that. That's like invited error. Well, that's what's basically happened here, isn't it? No, Your Honor, that's not what the evidence shows. We have numerous people who ---- The family told the lawyer this guy is sleeping, and the lawyer didn't do anything about it at the time, waited until the verdict came in to bring it up for the first time. And so at that time, as he had the obligation to do during trial, but didn't do it, he had to be effective. And so when he finally had this second opportunity where he needed to speak up, and the judge was very interested in this topic and offered him the opportunity to have a continuance, to call additional witnesses, almost suggesting that he ought to do that, but he didn't do it. My hypothetical was if it's not ineffective to let it pass for whatever reason, then you can't then pull it out at the end like the rabbit out of the hat after the verdict comes out. If the lawyer learns things that make ---- we have some evidence about the arrangement of the courtroom and how the lawyers couldn't see. So this lawyer couldn't actually see what was happening. Well, then maybe then it's not ineffective then. You told me at the beginning he was told by the family that the guy was sleeping and didn't do anything, and now he confesses this is a big error on his part. Are you telling me now that he couldn't see whether he was sleeping and really didn't know he was sleeping? I believe that all of the ---- the lawyer who was his assistant testified that she couldn't see and the judge couldn't see. But the family was telling the lawyer the guy is sleeping. That's correct. Okay. Right. And so they ---- Well, if that's true, if he knew from the family, has the lawyer waived that defense in effect for his client? Because he knew it, but he thought it would inure to his benefit to let the guy sleep. Well, not if the judge considers it a basis for granting a motion for new trial, as this judge obviously did. He went outside the normal rubric of the statutory motion for new trial and offered the attorney the opportunity to present evidence, even more evidence than he was presenting, and listened to the juror and dealt with it as an important issue of fact. And by the way, I just want to point out that the State and the magistrate judge treated this as if it were a matter that was entitled to the presumption of ---- excuse me, presumption of correctness. And that's not the case, because the issue of prejudice is an issue of law that this Court needs to address de novo. And so I want to talk just briefly about the evidence. I want to save two minutes, though, that this juror missed relative both to the issue of prejudice on the IAC claim and also as to the due process claim. So the primary witness that we know specifically that he slept through most of is Joanne Pastana. And she testified as to what clothing he was wearing and identified his shirt. And the shirt that was described by Michael Reinhart, that very specific shirt with the name of Michael Reinhart, was not the shirt that he was wearing and was not the shirt that she saw him wearing when he left the house. She testified, as I said, that she didn't see him go into Stacey Nick's house and that statements that were written down as if they were her statements were incorrect. This is an argument for a jury, not for an appellate panel. Isn't that jury argument, not a question for law on appeal? Well, we're talking about prejudice.  I'm saying that there was conflicting evidence. And what you're saying is the evidence is all one way. Is that what you're saying? No. I'm saying that he missed a lot of evidence that was exculpatory. And the ---- How do you know he missed that exact bit of testimony? We don't know which bits he missed, but we know that frequently ---- You just said he slept through it. I'm asking you, how do you know he slept through it? Every five minutes or so he dropped off or maybe every ten minutes or so he dropped off for a few minutes. Well, he said he was resting his eyes. Yes. But we ---- when I deposed him, he admitted that he falls asleep at every church, class, concert, movie. He cannot drive long distances. He has ---- he is afflicted with a disorder. And he testified very extensively about it for three hours, all the health problems that could possibly be a source of this. And when I brought this to Dr. Clayman, who's an expert at UCSF, he analyzed it and diagnosed this gentleman as having an untreated and unrecognized sleep disorder that he's just developed a lifetime of coping mechanisms. The State judge didn't think much of it himself, thought it was ---- as a matter of fact, if he was sleeping that much, I'd be amazed that this trial judge didn't notice it if this occurred. So ---- Well, the defense attorney testified that Judge Tochterman is well known for taking copious notes during trial. And the way that the people were seated, especially the alternate jurors, this was some kind of a makeshift courtroom. And I've been in that courtroom. There were several chairs that were set up for the alternates. So while Mr. Moon was an alternate who was not visible to trial counsel and he was not visible to the court, but he was visible to the person who was sitting next to him, Susan Turek, who was a very believable, credible, concerned alternate juror who works at the university in Sacramento. And so, anyway, I think I've answered the Court's question.  I do. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Good afternoon, Your Honor. Good afternoon. David Andrew Eldridge, Deputy Attorney General, for Respondent. Just addressing a couple of points first, this Court does not consider even claims of law de novo under 2254d1. So any prior advocate saying that because questions of law are viewed de novo are obviously changed by 2254d1. State court determinations of law must be unreasonable. Also, as to, well, I guess I'll try to go directly into the Schmeisser murder, because that seems to be where the big attack is. All the claims regarding so far, so-called Reinhart's failure to see, et cetera, none of them really address one of the most critical things about Reinhart, which is what he heard. Reinhart heard that Schmeisser asked defendant, or the person who was in the house, did you come to get the wire out of the vehicle? The defendant said yes. Well, no matter what one wants to think of Reinhart's eyesight, that person is defendant. No one else is going to be coming to get the wire that the defendant left in the car. And the State court appeal recognizes precisely the wire point in its opinion. So whatever claims there may be regarding Reinhart possibly couldn't see, he didn't recognize, he had one thing, which is what he heard, and that is he heard that this person was there and Schmeisser would have suspected this person, and the only person who could be a felon, was here to get the wire out of the car. Ms. Lebon makes the point that this jury deliberated for nine days. It must have been a tough case for them. And that underscores the prejudice from the ‑‑ from consulting the almanac, which shouldn't have occurred. You agree it shouldn't have occurred, right? I agree that it shouldn't have occurred. Yes, I agree it shouldn't have occurred. Okay. Ms. Lebon is a lawyer, and she says, you know, in a close case like this, any kind of error of this sort could affect the way it came out. Well, that's not ‑‑ there's no Supreme Court case that says anything like that. That the moment you can find anything that went wrong, you must assume that if the jury took a long time, or if there was any other reason it might have been difficult, then you must assume that it was prejudicial. There's nothing to link this thing to the verdict. In fact ‑‑ I understood Ms. Lebon to say that the jurors asked for this kind of information earlier and were not provided it, not satisfied with that. One juror went ahead and got it on his own, which kind of makes it look like it's pretty important to somebody. Well, I'm not going to say that no one could have assumed that the juror would have found it important. I'm saying the California Court of Appeal decision factually found it wasn't. Actually, well, in this one I'm not sure if it's truly factual or if to a degree it folds over into legal. However, in light of the evidence which they discussed, it was certainly reasonable to find it didn't make any difference in this case. And in particular, given that the major attack was on the Schmeisser murder, and no one but an appellant is going to be the person talking about getting the wire out of the truck, so ‑‑ The point is if a case is that close where a jury deliberates that long, it's obvious that small things make a big difference. I mean, if a jury is out for a half hour, well, you know it's an open and shut case. The little things are not going to ‑‑ but a little thing like this would weigh quite heavily. Would it not if it were that close a case where a jury takes it that long to resolve it? We don't always know why jurors take a long time, Your Honor. We just don't know. Yeah, but we can assume it, I think. All of us have talked to people that have been on jury duty, so we have some idea why they take so long because they're conflicted. And, Your Honor, but this isn't really up to you to decide factually why the jury might have taken a long time. The fact is the California Court of Appeal didn't have to conclude that because the jury took a long time, they were having trouble with this case of the sort that anything out there could have made a difference. To the contrary, they said this case was overwhelming. And you can't say that that's an unfair determination, that the case was overwhelming. It was. It couldn't be ‑‑ I'll tell you right now, perhaps my colleagues disagree, any case that takes a jury nine days to resolve is not overwhelming. Your Honor, that is a ruling effectively of law that you can't make. There's no Supreme Court case allowing for that. We just don't know sometimes why jurors take a long time. You think they would take nine days on an easy case, in other words, is that your position? I don't ‑‑ I don't assume that many double murder cases are generally inherently easy, Your Honor. So I'm not surprised by a juror taking a long time in a double murder case, period. Let me ask you about the sleeping juror. Yes. I want to make sure I got the story straight. I'm not sure I do. Do I understand correctly that the State judge took testimony from Mr. Moon, the guy who was sleeping? He testified, yes. And Moon testified, I wasn't sleeping, I was just resting my eyes. Right. But the judge would not take testimony from the other jurors because it would impeach their verdict? I believe, yes, I believe he excluded evidence. Explain to me how he can take testimony from the guy who said he wasn't sleeping, but he won't take testimony from the people who say he was sleeping. Well, it wasn't the district judge who ruled on Mr. Moon's testimony, Your Honor. It was the State court. So the State court did consider Moon's testimony. Okay. The State judge took the testimony? Yes, from Mr. Moon. Found him credible as to whether or not he'd been sleeping. Were there other jurors called at that time? I think that there were declarations. And did I – but that's what I'm getting at. Didn't the judge say I'm not going to consider these declarations because it would impeach the verdict? I'm not sure that the trial judge – I don't think the trial judge said that, Your Honor. I think that was in Federal court. I believe that was – Assume – if I have this right, assume it was the State judge who said I'm not going to consider these declarations. Well, if I – if I assume that, and I would have to further assume that he did it on the ground, that it would impeach the verdict rather than I find him credible and therefore I don't need to hear from him. Trying to understand how he could consider only the testimony of Rip Van Winkle and not the people who saw this guy sleeping, you know. He considers one but not the others is what I'm trying to get at. It's either all admissible or it's not admissible. Well, quite frankly, the juror would know whether he was sleeping. Others might be able to tell whether his eyes were closed. No, the testimony is the last person that would know whether he was sleeping if he's got a sleeping apnea or other problems is the person that's sleeping. I'm sorry? The last person that knows that he's sleeping or how long he has slept is the person that    It's not clear that someone with the – that illness or that bodily problem is not aware of how long he's slept. According to the expert? According to the evidence before the Court. And it's not contradicted. That was not before the trial judge. Just a matter of common knowledge, when the guy said, well, only slept for 15 seconds, how does he know how long he slept once you fall asleep? You know, you can't time yourself while you're asleep. He did testify to that, right? That he – He slept for only 15 seconds on one of the occasions. I think he said his eyes were really closed. I don't recall him saying he slept. That's another time. He said, well, I was resting my eyes, but I wasn't sleeping. But getting past that, I think the point – I think the point that's been made is that at least in the district court, in the habeas proceeding, right, the district court refused to consider all the testimony from these other jurors about whether or not Mr. Moon was sleeping, right? He said because it's barred by the California evidence code because it impeaches a verdict. Isn't that what he said? And he didn't consider that evidence? That wasn't the basis. I'm not sure – I want to be really clear. The district court. The federal district court. Right. There are two codes which will – which potentially will come into play because on one hand, the federal district judge must itself determine whether or not if we're going to have a hearing in federal court, this would be admissible. And he said it wasn't. He also didn't seem to depend on the juror's statement himself because he said at best, all this evidence would show was that he slept occasionally, which is insufficient under Tanner. No, but he applied the rule saying that, well, this testimony would not be admissible in the California court. That's what he said. Well, that certainly must go to whether or not counsel should have tried to produce it because counsel isn't a judge. No, no. What I'm getting at is so on that basis, he didn't consider it. He, meaning the district, federal district judge, right, he didn't consider all this evidence that was produced on whether or not the jurors – from other jurors saying that Moon was sleeping. The district judge did indeed exclude much of the evidence. Right. He excluded all that. Finding both that it was inadmissible, but also at best what was admissible would merely show occasional sleep, at best, which would be insufficient under Tanner. And the reason he was able to come to that, I think, that conclusion, because he didn't consider all the evidence. In other words, he excluded and did not consider a lot of the evidence he should have considered, like the, you know, like the testimony of these other jurors who said, yes, I saw Moon sleeping many times. Your Honor, I'm not sure of what provision required – said the district court should have considered that evidence. You're not sure what? I don't know when you say that he should have considered. He should have considered because it's admissible evidence. The district judge found it was not, Your Honor. You have 12 people who were there, and he only hears from one. The other 11 who want to testify, he says, I can't hear from them. Well, the district judge is not listening to even that juror, Your Honor. The district judge found that even if – Well, sure. He listened to Moon. He accepted Moon's statement that I wasn't sleeping. That was the trial judge, Your Honor, and the trial – Well, not only the trial judge, but then in turn the district court accepted that, too. The district judge's ruling was at a minimum alternately based on the fact that even taking all this evidence in or taking what was admissible, he only slept occasionally. That's the best showing you could make, and therefore, whether or not that's true, the district judge didn't need to determine, because under Tanner, even if that's true, it's insufficient. When you say taking all of the evidence, you're talking about – but you're leaving out a lot of evidence because he didn't take a lot of evidence. I'm not sure that the district judge really took much evidence at all, because, again, the district judge's ruling was even if there was occasional slumber. That's not sufficient under Tanner. So the district judge isn't necessarily crediting the juror's testimony that I never slept. That was by the trial judge, and it's not clear to the trial judge that I'm excluding the rest because it's inadmissible. Quite to the contrary, what the trial judge was saying, that I'm taking in the evidence I find incredible. All right. Let me ask you a preliminary question underlying all this. Is it your position that jurors testifying that a fellow juror slept is contrary to the California rule, which just about every State has, that a juror cannot impugn a verdict of a jury? Is it your position that that testimony of a fellow juror is impermissible? Because I understand this testimony is not impugning a verdict. This is testimony concerning something outside of the verdict. But I'm interested in the government's position on this, the State's position. Well, I don't think that was the basis on which the trial judge ruled, so I don't. Well, that's one of the things that I believe the district court here said that, or one of the judges said, I think it was the district court, that there's a California inhibition for a juror to testify that a fellow juror was sleeping. Is it your position that under California law, a fellow juror cannot testify concerning a fellow juror sleeping because it's, in effect, under the rubric of impugning a jury verdict? I don't have an answer off the top of my head for that one, Your Honor. I can give you a briefing on it, but I don't know. I have my own answer, but I was wondering what the State's answer is. You've got about a minute and a half left. I'm happy to answer your questions, but I have no further affirmative points to make. Thank you very much, Mr. Eldridge. Ms. LeVon, back to you. I have some answers to your questions. Of course. So one thing very important is that so the trial court listened to the jurors and did take testimony from the jurors in the form of their declarations and offered to defense counsel to present the jurors' live testimony and, in fact, took other jurors' live testimony on other points. This is the State trial judge? Yes. Okay. Including Mrs. Turek. And so the attorney chose not to do that and didn't want to bring those witnesses and, you know, basically slid, I think, far below the standard for effective assistance of counsel. But the district court, so we had two different magistrate judges. Magistrate Judge Droz granted my motion to add to the record all these declarations and the testimony and deposition of Mr. Moon, and then it was transferred to another magistrate judge, Judge Mould. And he raised all these evidentiary objections on his own without any raising by the State. The State has waived that. The State offered testimony by jurors about the deliberations when they offered Mr. Boland's testimony. They never objected to the admission of those declarations. And so they have waived it. There was a finding of recommendations allowing the – everything to be put into the record, and they did not bring that up to the district court. So this Court says that's a waiver. And in any event, as I said, throughout the State court proceedings, the State itself introduced that same kind of evidence and did not object in the State court. So the magistrate judge cannot start bringing up these defenses on behalf of the State to keep out evidence. And as Your Honor pointed out, it's not contrary to State law. Every piece of evidence that was sought to be admitted in this case was admissible under State law and, in fact, also under Federal law, almost all of it, especially the expert testimony, because expert testimony under the Federal rules can be admitted even if it includes reliance on something that wasn't admissible. Thank you, Ms. Boland. Mr. Eldridge, thank you to the case just argued as submitted.
judges: Cowen, Tashima, Silverman